STATE v. JOHN DAVID WOOTEN AND WEBB WARD.

(Filed 24 March, 1948.)

**1. Negligence § 23—**

Culpable negligence imports more than actionable negligence in the law of torts, and is such recklessness or carelessness, proximately resulting in injury or death, as is incompatible with a proper regard for the safety or rights of others.

**2. Automobiles § 28a—**

The violation of a safety statute regulating the use of highways does not constitute culpable negligence unless such violation is intentional, willful or wanton, or unless the violation, though unintentional, is accompanied by recklessness or is under circumstances from which probable death or injury to others might have been reasonably anticipated.

**3. Automobiles § 28e—Evidence of culpable negligence held sufficient for jury in prosecution for manslaughter.**

The evidence tended to show that two cars, traveling in opposite directions, collided head-on in the middle of the highway, disclosing a violation by each driver of the statutory requirement that each driver, under such circumstances, should yield to the other at least one-half of the main traveled portion of the highway as nearly as possible. G. S., 20-148. The collision resulted in the death of several passengers. There was evidence that even if the violation of the statute were unintentional, each defendant was driving his automobile carelessly and heedlessly, without due caution and circumspection under circumstances from which probable death or injury to others should have been anticipated with reasonable

prevision. *Held:* The evidence was sufficient to support the verdict of guilty of manslaughter as to each defendant.

**4. Criminal Law § 81b—**

Where the charge of the court is not in the record it will be assumed that it is free from error.

APPEAL by defendant from *Williams, J.,* at September Term, 1947, of MARTIN.

Criminal prosecution upon two separate bills of indictment—one charging that John David Wooten "feloniously and willfully did kill and slay one Henry Ward," etc., and the other charging that Webb Ward "feloniously and willfully did slay one Mary Brown and Mae Riddick," etc., by consent, consolidated for the purpose of trial.

These indictments, it appears to be uncontroverted, grew out of a collision on 15 December, 1946, between an automobile owned and operated by defendant John David Wooten, traveling south on State Highway 903, from Robersonville, N. C., in which four others, Steve Little, Mary Brown, Gladys (Mae) Riddick and Jesse Spain were riding, and an automobile owned and operated by defendant Webb Ward, traveling north on same highway toward Robersonville, in which his uncle Henry Ward was a passenger. The collision occurred about a mile south of Robersonville on a right-hand curve,—looking south.

At the trial, in addition to evidence tending to show the above facts, the State offered, as its- only witness, W. T. Simpson, the chief of police of the town of Williamston, who testified in pertinent part: "On December 15, 1946, I was a member of the State Highway Patrol—stationed in Martin County. I went to the scene of the collision . . . arriving there about 6:15. I saw Webb Ward and John David Wooten at that time . . . I talked with both of them later . . . When I arrived both vehicles were sitting with the front ends about middle way the highway, and their rear ends on the edge of the shoulder,—the right-hand shoulder going from Robersonville . . . The front ends were joined up, and the back ends were about two feet from each other. There was no center line in the highway, but the front end of both cars was about the center of the highway in the curve . . . no one was in either car when I got there. Henry Ward was lying out in the field, dead; . . . Mary Brown and Mae Riddick—one was lying out in the field, dead, and the other was hurt pretty bad; she died . . . that night. They were riding in John David Wooten's car—he told me later. I did not talk to Webb Ward and John David Wooten together. I talked to Wooten in the hospital and Ward at his home." Then in response to question, "What did Wooten tell you?", this testimony was admitted· as against defendant Wooten: "Wooten told me he was on his side of the road and saw this

other vehicle coming and did not know who was driving it, and that he was on his side when he went into this curve; he said he pulled over to pass on the left side of him, and about the time he pulled over to miss that vehicle, that that vehicle pulled over and they both met in the middle of the highway. He said he was going about 40 or 45 miles per hour . . ."

Then in response to question, "What did Webb Ward tell you?", this testimony was admitted as against defendant Ward: "Ward told me he was going down the road and he saw a car in front of him on his side of the road, and that it cut further over and to keep it from hitting his car he cut over to his left and the other car cut in front of him." Then the witness continued: "Both gave the same explanation, and both said the collision occurred in the middle of the highway . . . I could not tell that night that either had had anything to drink. Wooten told me later that he had had a beer, and Ward said later that he had not had anything . . . The collision happened on a curve. There is a bank there, but you can see a car at any point on that curve 350 or 400 yards. Both the defendants told me that it was after dark when the collision occurred, and that each had his headlights turned on . . . Ward said he was driving around 35 or 40 miles per hour . . . a brand new car . . . Everyone in the cars was hurt . . . seven in them, two killed, one died later on, and four put in the hospital . . . John David Wooten was on the inside of the curve."

The State here rested its case.

Defendants, reserving exceptions to denial of motion for judgment as of nonsuit, offered evidence as follows:

### DEFENDANT WEBB WARD'S EVIDENCE

Webb Ward, as witness for himself, testified: "I live one mile from Pactolus, in Pitt County . . . On Sunday night, December 15, 1946, I and my uncle, Henry Ward, were driving my 1946 Studebaker heading to Robersonville. And going around that curve there . . . in fact I passed Robert Lee Richardson . . . and passed him in that curve I was meeting this Wooten fellow. I was on my right side of the road, going around the curve, and I could not tell what side he was on, but he was supposed to be on the left side. I was on the right side of the road, going around the curve, and my uncle said, 'Watch out, Jack, he is going to hit you,' and he had done hit me. I don't remember anything after the cars hit . . . I reckon I was traveling about 35. My lights were on. I might have told Mr. Simpson that I turned to the other side to keep from hitting the other car. I was real sick when he came to see me. I was on the outside of the curve. The car was right at me on the curve when I saw it. I did not even attempt to turn to the left to miss him or

to turn on the shoulder. I did not have time to turn to the right or left . . . nor did I put on brakes. I could not tell whether he was on my side or his side. He hit me by the time my uncle said 'Look out, Jack.' There was no use turning out. I might have told Mr. Simpson I turned to the left, but I don't know for sure." Defendant Webb Ward rested his case.

### DEFENDANT JOHN DAVID WOOTEN'S EVIDENCE

John David Wooten, as witness for himself, testified in pertinent part: "I live at Fleming's Cross-Roads . . . When the wreck happened I was going towards Stokes. I seed the car coming fast, and I tried to miss the car, and I goes to the other side of the road to miss the car, and it was coming to my side of the road, and we had a collision about the middle of the highway. We hit about the middle of the road about the middle of the curve. I tried to miss the car, and left my side and took his side, and he went back to his side of the road, and that made me take my side of the road back, and I could not miss him, and I hit him. Both of us turned just like the chief said . . . I 'come to' on Monday, and talked with Mr. Simpson on Tuesday, I think. I told him what he testified I said, except that I told him I was driving 35 or 40 miles per hour. I had the inside of the curve. There is a hill in the curve. The other car was about the distance of three times the length of this court-room from me when I realized it fwas on my side of the road. I did the first thing that come to my mind to miss him. I don't know why I did not pull to the right. I had drunk one bottle of beer that morning, and it was dead and had left me by the time of the accident . . . I have heard since that Gladys Riddick was 13 or 14 years old. I was not dating her . . . I started to the other man's side of the road, but I did not get there . . . when I started to his side, he started back and we had a collision about the middle of the highway . . . I talked with Mr. Atkinson about this wreck."

Stephen Little, as witness for defendant Wooten, testified: "I got up John Wooten . . . he was driving between 30 and 35 miles an hour, and when he got to the hill he was still on his right side . . . I was sitting in the back . . . right behind the driver. I did not know either one of the girls. Jesse Spain and one of the girls was in the back seat with me . . . Nobody said anything just before the wreck to indicate that a collision was about to happen."

Defendant John David Wooten rested his case.

Thereupon defendant Webb Ward offered in rebuttal these witnesses:

First—Anthony Atkinson, who testified, in pertinent part, "I know Wooten. I went to him after this collision. It was my granddaughter that got killed, and I talked to him and he told me he was driving on the left-hand side of the road and he saw he was going to hit and he started

across on the right-hand side, but they hit him . . . he told me that he was on the left-hand side, and when he saw the car coming he tried to get on the right-hand side."

Second—James Ward, who testified: "I heard John David Wooten talking to my son, George Henry Ward, the next Saturday after the wreck on the corner of Home Grocery Store in Greenville, and he said he was going along on the left-hand side of the road, and the other car was coming so fast he could not get back. I am Ward Webb's uncle."

Third—James Daniel, who testified: ". . . I asked John David Wooten how the wreck happened. He told me that he was going down the road driving pretty speedy, and he said Steve was telling him this thing won't run, and that he drove faster until by and by he was right up on the other car, before he knew it, and there was a girl sitting on his lap and he could not half drive . . . I am no kin to John."

Thereupon, John David Wooten, recalled to the witness stand, denied the statement attributed to him by the three witnesses last above.

Defendants, at the close of all the evidence, renewed their motion for judgment as of nonsuit, and to denial thereof they excepted.

Verdict: Defendants, John David Wooten and Webb Ward—Guilty.

Judgment: Confinement in the State's Prison (1) as to defendant John David Wooten for not less than 7 nor more than 10 years, and (2) as to defendant, Webb Ward, for not less than 3 nor more than 5 years.

Defendants appeal to Supreme Court and assign error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*William J. Bundy for John David Wooten.*

*Hugh G. Horton for Webb Ward.*

WINBORNE, J. When all the evidence offered on the trial of this case in the court below is taken in the light most favorable to the State, did the trial court err in denying defendants' motion for judgment as of nonsuit aptly made at the close of all the evidence, pursuant to provisions of G. S., 15-173? In other words, is the evidence, so taken, sufficient to support a verdict of guilty of the charge under which defendants are indicted. This is the determinative question involved on this appeal.

A careful consideration of the evidence in the light of pertinent principles of law leads to the conclusion that the evidence is sufficient to support the verdict, and that there is no error.

Applicable principles of law are found in the case of *S. v. Cope,* 204 N. C., 28, 167 S. E., 456, where in opinion by *Stacy, C. J.,* the line which separates the principle of actionable negligence in the law of torts, and that of culpable negligence in the law of crimes is delineated, and

in accordance therewith previous decisions of this Court are aligned. As there summarized, these are pertinent principles: "Culpable negligence in the law of crimes is something more than actionable negligence in the law of torts. . . . Culpable negligence is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others. . . . And an intentional, willful or wanton violation of a statute or ordinance, designed for the protection of human life or limb, which proximately results in injury or death, is culpable negligence. . . . But an unintentional violation of a prohibitory statute or ordinance, unaccompanied by recklessness or probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, is not such negligence as imports criminal responsibility. . . . However, if the inadvertent violation of a prohibitory statute or ordinance be accompanied by recklessness or probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, amounting altogether to a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others, then such negligence, if injury or death proximately ensue, would be culpable and the actor guilty of an assault or manslaughter, and under some circumstances of murder."

Moreover, the statutes relating to operation of motor vehicles upon the public highways of this State declare: (1) That "any person who drives any vehicle upon a highway carelessly and heedlessly in willful or wanton disregard of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving, and upon conviction shall be punished . . ." G. S., 20-140; (2) that "drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other at least one-half of the main traveled portion of the roadway as nearly as possible," G. S., 20-148; and (3) that "it shall be unlawful and constitute a misdemeanor for any person to violate any of the provisions of this article unless such violation is by this article or other law of this state declared to be a felony," G. S., 20-176 (a),—and the punishment for violation of various sections, including G. S., 20-148, follows in G. S., 20-176 (b).

Testing the evidence in the present case by these principles, it tends to show, and is sufficient to justify the jury in finding that as the vehicles were meeting each other, traveling in opposite directions, the drivers were violating the provisions of the statute, G. S., 20-148, requiring each to give to the other at least one-half of the main traveled portion of the roadway as nearly as possible. The evidence is that the two vehicles collided in the middle of the road. And the evidence tends to show, and is sufficient to justify the jury in finding that at the time of the collision,

even though the violation of the statute, G. S., 20-148, be unintentional, each of the defendants was driving his automobile carelessly and heedlessly, without due caution and circumspection and in a manner so as to endanger or be likely to endanger persons on the highway when tested by the rule of reasonable prevision. Injury and death did ensue. In all it was a question for the jury.

And in the absence of the charge, it will be assumed that the court properly charged the law applicable to the evidence in the case.

Hence, in the judgment from which appeal is taken, we find

No error.