**NORTH CAROLINA STATE BOARD OF ELECTIONS, Plaintiff,**

**Ashley Stephenson, Leo Daughtrey, Patrick Ballantine, Art Pope, and Bill Cobey, Plaintiff–Intervenors,**

v.

**UNITED STATES and John Ashcroft, as Attorney General of the United States, Defendants,**

**Marc Basnight and James Black, Defendant–Intervenors and Counterclaimants,**

**Linda Sample, Defendant–Intervenor.**

No. Civ.A. 021174LFODSTGK.

United States District Court, District of Columbia.

July 01, 2002.

Douglas W. Baruch, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, Michael Crowell, J. Thomas Spiggle, Tharrington, Smith & Hargrove, Raleigh, NC, for Plaintiff.

Joseph D. Rich, Voting Section, U.S. Department of Justice Civil Division, Washington, DC, Thomas Christian Herren, Jr., Department of Justice Voting Section/Civil Rights Division, Washington, DC, D. James Greiner, Jenner & Block, Michael Carvin, Jones, Day, Reavis & Pogue, Washington, DC, Nathanael K. Pendley, Clemmons, NC, for Defendants.

Before TATEL, Circuit Judge, and OBERDORFER and KESSLER, District Judges.

## MEMORANDUM

PER CURIAM.

On June 27, 2002, this Court denied the Counterclaimants' Emergency Motion for Injunctive Relief, for reasons to be more fully stated in a memorandum to be filed. This is that memorandum.

## I. BACKGROUND

On November 13, 2001, the North Carolina General Assembly enacted a redistricting plan for the state Senate and

House based on the 2000 census ("the General Assembly's 2001 plan"). On February 11, 2002, the Department of Justice precleared the General Assembly's 2001 plan pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c.

On the same day that the General Assembly enacted its 2001 plan, the Plaintiff–Intervenors in this action—Ashley Stephenson, an individual voter, several Republican members of the General Assembly; and the Chairman of the North Carolina Republican Party ("the Stephenson Intervenors")—filed suit in the Superior Court of Johnston County, North Carolina, alleging that the General Assembly's 2001 plan violated 1968 amendments to the North Carolina Constitution. Those amendments proscribed redistricting plans which divided counties.[1]

On February 20, 2002, the Honorable Knox V. Jenkins Jr., of the Johnston County Superior Court, ruled that the General Assembly's 2001 plan was invalid in light of the 1968 amendments. Judge Jenkins also enjoined the implementation of the General Assembly's 2001 plan but stayed his order pending appeal. On March 7, 2002, the Supreme Court of North Carolina enjoined the primary elections for the state Senate and House scheduled for May 7, 2002. On March 12, 2002, the North Carolina State Board of Elections ("the Board") voluntarily postponed primaries for all other offices also scheduled for that date. Acting on a submission by the Board, the Department of

Justice precleared the state supreme court's injunction and the Board's voluntary postponement on March 15, 2002.[2]

On April 30, 2002, the North Carolina Supreme Court affirmed Judge Jenkins's ruling, holding that the 1968 amendments were enforceable and must be adhered to in redistricting. *See Stephenson v. Bartlett,* 355 N.C. 354, 562 S.E.2d 377 (2002). The court remanded to Judge Jenkins, authorizing him to adopt a new redistricting plan consistent with *Stephenson* and "to seek preclearance thereof, for use in the 2002 election cycle." *Id.* at 398. The Board subsequently applied to the Supreme Court of the United States for a stay of the *Stephenson* decision pending appeal. On May 17, 2002, Chief Justice William Rehnquist, as circuit justice, denied the application. *See Bartlett v. Stephenson,* —— U.S. ——, 122 S.Ct. 1751, 152 L.Ed.2d 1015 (2002).

On May 31, 2002, Judge Jenkins created a new plan ("the state court's 2002 plan"). On June 12, 2002, he asked the Department of Justice to preclear his plan. The Department of Justice represents that it will not complete its review of the state court's 2002 plan before the week of July 8, 2002. Meanwhile, it has in its files its own November 30, 1981 letter refusing to preclear the 1968 amendments. *See* Letter from Wm. Bradford Reynolds, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Alex Brock, Executive Secretary and Directors, North Carolina State Board of Elections, dated November 30, 1981.[3] The North

---

1. These amendments are now contained in Sections 3 and 5 of Article II of the North Carolina Constitution. Section 3(3) provides that "[n]o county shall be divided in the formation of a senate district." N.C. Const. art. II, § 3(3). Section 5(3) provides that "[n]o county shall be divided in the formation of a representative district." N.C. Const. art. II, § 5(3).

2. While the Department of Justice precleared a delay of the entire 2002 primary process, it did not preclear the elimination of any element of it, such as a runoff election.

3. The letter indicated that the refusal to preclear the 1968 amendments rendered them unenforceable "until the objection is withdrawn or [a] judgment from the [United States District Court for the] District of Columbia is obtained," thus permitting the state

Carolina Supreme Court concluded in *Stephenson* that the 1968 amendments could be harmonized with the Department of Justice's 1981 objection.

On June 13, 2002, the Board filed its complaint in this Court also requesting preclearance of the state court's 2002 plan. The Board additionally seeks preclearance of the *Stephenson* ruling and the constitutional amendments that it applied.

Meanwhile, two other actions have been filed in the United States District Court for the Eastern District of North Carolina and are pending before three-judge courts there. In *Sample v. Jenkins,* No. 02–CV–383 (E.D.N.C. filed June 13, 2002), the plaintiff challenges the state court's 2002 plan. In *Foreman v. Bartlett,* No. 01–CV–166 (E.D.N.C. filed Nov. 13, 2001), the plaintiffs challenge Congressional redistricting plans which are not presently before this Court.

On June 20, 2002, the *Sample* plaintiff filed a motion requesting that the North Carolina three-judge court enjoin the Board from implementing the as yet unprecleared state court's 2002 plan and require it to implement the precleared General Assembly's 2001 plan. A hearing on that motion has been scheduled for July 2, 2002. The *Sample* plaintiff subsequently filed a motion to intervene as a defendant in the Board's lawsuit here, which this Court granted on June 26, 2002.

On June 14, 2002, Marc Basnight, President *Pro Tempore* of the North Carolina Senate, and James B. Black, Speaker of the North Carolina House of Representatives ("the Counterclaimants"), along with the Stephenson Intervenors identified above, moved to intervene as defendants and plaintiffs, respectively, in the Board's case in this Court. The Counterclaimants

filed an answer and a counterclaim. The motions to intervene were granted on June 25, 2002.

On June 21, 2002, the Counterclaimants filed this emergency motion for injunctive relief, which is the only matter presently before this Court for decision. The Counterclaimants' motion seeks an injunction 1) preventing the Board from implementing the unprecleared state court's 2002 plan, and 2) requiring the Board to proceed forthwith to prepare for and to conduct 2002 elections for the North Carolina House and Senate pursuant to the precleared General Assembly's 2001 plan. The Counterclaimants, who are also defendants in *Sample,* concurred in the *Sample* plaintiff's motion seeking similar relief in the Eastern District of North Carolina.

The Counterclaimants argue that the injunctive relief they seek is the only way to avoid the elimination of primary runoff elections in North Carolina's 2002 election cycle, a consequence that the Counterclaimants allege will have a retrogressive effect. The Board has represented, both at oral argument and by affidavit, that unless it has a precleared plan in hand by June 28, 2002, it will not be able to conduct runoff primary elections. *See* Affidavit of Gary O. Bartlett, Executive Director of the North Carolina State Board of Elections ¶ 4. The Board proffers another affidavit stating that the 2002 election will involve "a sufficiently large number of candidates," including many minority candidates, "so that a second primary is probable." Second Affidavit of Gary O. Bartlett, Executive Director of the North Carolina State Board of Elections ¶ 3.

The elimination of the 2002 primary runoff, the Counterclaimants contend, would impermissibly reduce the voting power of

---

to seek preclearance of the amendments again. Chief Justice Rehnquist denied the application for a stay, making the same observation. *See Bartlett v. Stephenson,* —— U.S. ——, 122 S.Ct. 1751, 1752, 152 L.Ed.2d 1015 (2002)

several hundred thousand minority voters, thus constituting a retrogressive change in voting in violation of Section 5. *See* Report of Allan J. Lichtman at 13–14 ("If delay in the implementation of state legislative elections results in the elimination of run-off elections, that result, by itself, would likely constitute retrogression of black voter opportunities.") (attached as Exhibit A to the Counterclaimants' Emergency Motion for Injunctive Relief). The North Carolina State Conference of Branches of the NAACP has moved to appear as *amicus curiae* in this matter and submitted a brief also arguing that the elimination of the runoffs would be retrogressive. The Counterclaimants maintain that the only way to avoid delay in the electoral process, and thus prevent this retrogressive result, is immediately to enjoin the implementation of the unprecleared state court's 2002 plan and to require the Board to implement the precleared General Assembly's 2001 plan.

## II. DISCUSSION

Before addressing the claim for injunctive relief, we address, as we must, our jurisdiction. The Board filed this lawsuit pursuant to Section 5 of the Voting Rights Act of 1965. Section 5 authorizes this Court to make substantive determinations concerning whether changes in voting covered by the Act have the purpose or effect "of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. This Court and the Attorney General of the United States have "exclusive authority" to make these determinations. *Lopez v. Monterey County*, 519 U.S. 9, 23, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996). A voting change that does not receive such preclearance is unenforceable. *See id.* at 20, 117 S.Ct. 340.

Section 5's prohibition on unprecleared voting changes "require[s]" a three-judge district court to which the matter is presented to enjoin their implementation.

*Clark v. Roemer*, 500 U.S. 646, 654, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991). It is undisputed that this Court has the power to issue such an injunction. *See, e.g., New York v. United States*, 869 F.Supp. 10, 13 (D.D.C.1994). Accordingly, this Court has jurisdiction to enjoin the Board from implementing the state court's 2002 plan before it is precleared.

We are far less certain that we have jurisdiction with respect to the precleared General Assembly's 2001 plan, which is the subject of the second half of the Counterclaimants' request for injunctive relief. Although our jurisdiction under Section 5 is exclusive, it is not unlimited. For example, Section 5 distinguishes between " 'coverage' questions" and " 'substantive discrimination' questions," and authorizes this Court to decide only the latter. *Allen v. State Bd. of Elections*, 393 U.S. 544, 559, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). As this Court explained in *Beer v. United States*, 374 F.Supp. 357 (D.D.C. 1974), the "sole function" that Section 5 commits to this Court "is an inquiry focusing exclusively on the existence or nonexistence of racial discrimination resultant from" a covered change in voting. *Id.* at 362. In *Beer*, the three-judge court denied a request by a group of *amici curiae* to set a timetable for the elections under review. In so doing, the court explained that its limited inquiry "cannot properly extend to tangential issues—though important issues—which Congress felt could best be handled in local district courts." *Id.* The court continued, "Nothing in the text or legislative history of Section 5 indicates congressional contemplation that the court was to become involved in the intricacies of local political redistricting, or was to take over the traditional responsibility of a local court to resolve questions more conveniently litigable before its bench." *Id.*

Given these recognized limitations on this Court's jurisdiction, perhaps it is not surprising that the parties have been unable to cite another instance in which a three-judge panel of the United States District Court for the District of Columbia, exercising its jurisdiction as to substantive discrimination questions presented by a plan submitted for Section 5 preclearance, granted injunctive relief with respect to another redistricting plan that was not and had never been before it. Rather, the case law reflects only instances in which this Court enjoined the implementation of uncleared plans, a power that, as stated above, is beyond dispute. This was true even in the case that may most closely resemble this one, *South Carolina v. United States*, 589 F.Supp. 757 (D.D.C.1984), and which the Counterclaimants cite in support of their broad conception of our jurisdiction. In that case, this Court had previously enjoined the implementation of a plan that was still pending before it for preclearance. Prior to the trial, the state began to implement an uncleared "interim" plan to allow for timely elections. A state political party filed suit in the District of South Carolina seeking to enjoin implementation of the interim plan, and the United States moved for identical relief in this Court. This Court granted the injunction, stating that its jurisdiction to do so was an "incident" to the preclearance proceedings and that to do otherwise would enable the state "to evade the preclearance process." *Id.* at 759. Thus, in that case, this Court acted to prevent the subversion of the preclearance process.

The Counterclaimants argue that this Court can exercise the affirmative power to require the Board to implement the General Assembly's 2001 plan because this issue is not "tangential" to its Section 5 inquiry and thus not barred by *Beer's* jurisdictional discussion. They rely in particular on *Busbee v. Smith*, 549 F.Supp. 494 (D.D.C.1982), arguing that it severely lim-

ited *Beer*'s description of our Section 5 jurisdiction. In *Busbee*, the three-judge court, in contrast to *Beer*, imposed a special election schedule for two Congressional seats. This action, however, was primarily a product of circumstances not present in this case. In *Busbee*, the court denied preclearance to one redistricting plan submitted by the state of Georgia but granted preclearance to a revised one. The state submitted to the Attorney General for preclearance a new election schedule for use in conjunction with the precleared plan. After failing multiple times in those proceedings to devise an election schedule that would satisfy Section 5, the state asked the three-judge court to create one. The court did so, concluding that such a "departure from the usual procedure" was warranted "under the[ ] circumstances" and "did not raise any jurisdictional problems." *Id.* at 522. The court noted that *Beer* "in no way undermines th[is] jurisdictional finding" because; in contrast to the situation there, in *Busbee* "the election itself must be approved under section 5, and this court's clear authority to reject it implies a corresponding authority to specify a schedule—especially pursuant to a request of the state—that would be nondiscriminatory in purpose and effect." *Id.* at 522 n. 10. We would face a situation similar to that in *Busbee* if the Board implemented either the state court's 2002 plan (after obtaining preclearance of it) or the General Assembly's 2001 plan but without the primary runoff elections that are part of North Carolina's traditional electoral timetable.

At any rate, we need not resolve the difficult issue of our jurisdiction in this regard, because the record demonstrates that another three-judge district court will soon address a parallel request for the same relief and has unambiguous jurisdiction to do so. As noted above, a claim similar to that posed by the second half of

the Counterclaimants' motion here is currently pending in the Eastern District of North Carolina in *Sample*. That three-judge court is scheduled to hear the matter on July 2, 2002. Its jurisdiction to consider these claims is, in contrast to our own, quite clear, and unquestioned by the parties in this lawsuit. This includes the authority to devise any temporary remedies that may be necessary or appropriate depending on how that court rules on the request for injunctive relief. *See Lopez*, 519 U.S. at 23–24, 117 S.Ct. 340. Moreover, notwithstanding the Board's assertions, *see* pages 5–6, *supra*, we are unconvinced on this record that it would not be possible to implement either the General Assembly's 2001 plan or the state court's 2002 plan with runoffs. As we understand the situation, several of the primary election timeframes—such as the time between the first and second primaries—could be shortened. In other words, we think the three-judge court in North Carolina has both the authority and ability, if necessary, to assure the availability of a runoff election.

In light of the availability of a perfectly adequate remedy elsewhere, in a case involving almost all the same parties that are here in a court with unambiguous authority and intention imminently to hear the same claim, we decline to enter into relatively unchartered jurisdictional waters. Thus, on June 27, 2002, we denied, without prejudice, the Counterclaimants' request to enjoin the Board to implement the General Assembly's 2001 plan.

■ The Counterclaimants' request that we enjoin the implementation of the state court's 2002 plan is also pending in the Eastern District of North Carolina, but the record before us and our clear jurisdiction over the matter enable us to consider this claim. The exigencies of the circumstances require us to treat the Counterclaimants' motion as one for a preliminary

injunction. To obtain a preliminary injunction, a party must demonstrate: "1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995) (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989)).

■ The record presently before this Court persuades us that the Board has no present or future intention of implementing the state court's 2002 plan prior to obtaining preclearance of it. That the Board filed this Section 5 lawsuit reflects its understanding that preclearance is necessary before it may prepare or conduct elections based on the state court's 2002 plan. Furthermore, the Board represented at oral argument that it believes it is under state injunctions not to implement the state court's 2002 plan before it is precleared and not to ever implement the General Assembly's 2001 plan. Indeed, the North Carolina Supreme Court's order enjoining the Board from conducting the primaries was itself precleared by the Department of Justice. Therefore, an injunction is not necessary in order to prevent the risk or irreparable harm to the Counterclaimants or to anyone else. Indeed, such an injunction may even be redundant in light of the previous rulings by state courts in North Carolina.

### III. CONCLUSION

For these reasons, we have denied the Counterclaimants' motion for injunctive relief, but without prejudice to its being refiled should circumstances change. In the meantime, we will refrain from addressing the substantive preclearance determination

before us. The Department of Justice, which is a defendant in this action, has repeatedly represented that it expects to complete its consideration of the state court's 2002 plan by the week of July 8, 2002. In reliance on that representation, we do not consider the Board's preclearance submission at this time.