ASHLEY STEPHENSON, INDIVIDUALLY, AND AS A RESIDENT AND REGISTERED VOTER OF BEAUFORT COUNTY, NORTH CAROLINA; LEO DAUGHTRY, INDIVIDUALLY, AND AS REPRESENTATIVE FOR THE 95TH DISTRICT, NORTH CAROLINA HOUSE OF REPRESENTATIVES; PATRICK BALLANTINE, INDIVIDUALLY, AND AS SENATOR FOR THE 4TH DISTRICT, NORTH CAROLINA SENATE; ART POPE, INDIVIDUALLY, AND AS REPRESENTATIVE FOR THE 61ST DISTRICT, NORTH CAROLINA HOUSE OF REPRESENTATIVES; AND BILL COBEY, INDIVIDU-ALLY, AND AS CHAIRMAN OF THE NORTH CAROLINA REPUBLICAN PARTY AND ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED V. GARY O. BARTLETT, AS EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; LARRY LEAKE, ROBERT B. CORDLE, GENEVIEVE C. SIMS, LORRAINE G. SHINN, AND CHARLES WINFREE, AS MEMBERS OF THE STATE BOARD OF ELECTIONS; JAMES B. BLACK, AS SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; MARC BASNIGHT, AS PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; MICHAEL EASLEY, AS GOVERNOR OF THE STATE OF NORTH CAROLINA; AND ROY COOPER, AS ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA

No. 94PA02-2

(Filed 16 July 2003)

### Elections— legislative redistricting plans—failure to strictly comply with criteria

The trial court did not err by determining that the General Assembly's 2002 revised redistricting plans are unconstitutional because the evidence supports the trial court's findings of fact that the 2002 revised redistricting plans failed to be in strict compliance with virtually all *Stephenson I* criteria, including excessive division of counties; deficiencies in county groupings; and substantial failures in compactness, contiguity, and communities of interest.

Justices ORR and MARTIN did not participate in the consideration or decision of this case.

Justice PARKER dissenting.

On appeal pursuant to N.C.G.S. § 7A-31(b) prior to determination by the Court of Appeals from an order and an amended order, both entered 31 May 2002 by Judge Knox V. Jenkins, Jr., in Superior Court, Johnston County. Heard in the Supreme Court 10 March 2003.

*Haynsworth Baldwin Johnson & Greaves, LLC, by Thomas A. Farr and Phillip J. Strach; Maupin Taylor & Ellis, P.A., by James C. Dever, III and Terence D. Friedman; and Hunter Higgins Miles Elam & Benjamin, by Robert N. Hunter, Jr., for plaintiff-appellees.*

STEPHENSON v. BARTLETT

[357 N.C. 301 (2003)]

*Roy Cooper, Attorney General, by Edwin M. Speas, Jr., Chief Deputy Attorney General, and Tiare B. Smiley, Norma S. Harrell, Alexander McC. Peters, and Susan K. Nichols, Special Deputy Attorneys General, for defendant-appellants.*

*Robert P. Quinn, M.D., amicus curiae.*

LAKE, Chief Justice.

The sole issue presently before this Court in this case is whether the trial court correctly determined that the General Assembly's 2002 revised redistricting plans are unconstitutional. After careful review, we conclude the trial court ruled correctly, and we therefore affirm.

The procedural history of this case is reported in detail in *Stephenson v. Bartlett*, 355 N.C. 354, 358-60, 562 S.E.2d 377, 381-83 (2002) (*Stephenson I*). We nonetheless recite the basic procedural history below to include events that have transpired since this Court issued its decision in *Stephenson I*.

In November 2001, the North Carolina General Assembly adopted legislative redistricting plans. *Id.* at 358, 562 S.E.2d at 381. We hereinafter refer to the General Assembly's 2001 redistricting plans, Senate Plan 1C and Sutton House Plan 3, as "the 2001 redistricting plans." On 13 November 2001, plaintiffs filed a complaint alleging that the 2001 redistricting plans violated the "Whole-County Provisions" (the WCP) of the North Carolina Constitution (the State Constitution). *Id.; see also* N.C. Const. art. II, §§ 3(3), 5(3). Plaintiffs argued that the WCP prohibited the General Assembly from dividing counties in creating legislative districts except to the extent required by federal law. *Stephenson I*, 355 N.C. at 358, 562 S.E.2d at 381.

On 19 November 2001, defendants removed the case to federal court. *Id.* at 358, 562 S.E.2d at 382. On 20 December 2001, the United States District Court for the Eastern District of North Carolina remanded the case back to state court. *Id.* The district court concluded that the case involved only issues of state law and that defendants' removal to federal court was thus improper. *Id.* The United States Court of Appeals for the Fourth Circuit subsequently denied defendants' motion to stay the district court's order of remand. *Id.*

On 20 February 2002, the trial court granted plaintiffs' motion for summary judgment. *Id.* The trial court concluded that the 2001 redistricting plans violated the WCP of the State Constitution. *Id.* at

358-59, 562 S.E.2d at 382. The trial court's order stated that "the General Assembly must preserve county lines to the maximum extent possible, except to the extent counties must be divided to comply with . . . the Voting Rights Act . . . and the U.S. Constitution." *Id.* at 359, 562 S.E.2d at 382.

On 30 April 2002, in *Stephenson I*, this Court modified and affirmed the trial court's decision, *id.* at 386, 562 S.E.2d at 398, and ordered the trial court to hold an expedited hearing on the feasibility of allowing the General Assembly the first opportunity to develop new plans, *id.* at 385, 562 S.E.2d at 398. However, this Court held that if the General Assembly was unable to develop revised constitutional plans meeting the guidelines established in *Stephenson I*, the trial court should adopt its own interim remedial plans and seek preclearance of any such plans from the United States Department of Justice (USDOJ). *Id.* This Court also "authorized [the trial court] to take all necessary remedial actions to ensure that the primary elections for legislative offices are conducted in a timely and expeditious manner and consistent with the general election scheduled for 5 November 2002." *Id.* at 381 n.7, 562 S.E.2d at 395 n.7.

On 6 May 2002, defendants sought an emergency stay of the *Stephenson I* decision in the United States Supreme Court, contending that *Stephenson I* violated the Voting Rights Act of 1965 (the VRA) and would require the enforcement of unprecleared state constitutional provisions. On 17 May 2002, Chief Justice Rehnquist denied the stay request, noting that because "there is no plan in North Carolina to hold elections in unprecleared districts, there are no grounds for granting a stay." *Bartlett v. Stephenson*, 535 U.S. 1301, 1304-05, 152 L. Ed. 2d 1015, 1018 (2002) (Rehnquist, C.J., in chambers).

On remand, the trial court concluded that sufficient time existed for the General Assembly to submit new redistricting plans and ordered that such plans be submitted by 20 May 2002. The trial court also stated: "No plan submitted by the General Assembly and approved by this court, or in the absence of such a plan, no plan adopted by the court, shall be administered in the 2002 elections until such time as it is precleared pursuant to Section 5 of the Voting Rights Act." On 17 May 2002, the General Assembly enacted new redistricting plans and submitted these plans to the trial court by the 20 May 2002 deadline. We hereinafter refer to the General Assembly's revised 2002 plans—identified by the General Assembly as "Fewer Divided Counties" and "Sutton 5"—as "the 2002 revised redistricting plans." On 31 May 2002, following a hearing, the trial court concluded

**STEPHENSON v. BARTLETT**

[357 N.C. 301 (2003)]

that the 2002 revised redistricting plans failed to satisfy the constitutional requirements specified in *Stephenson I*. Pursuant to our mandate in *Stephenson I*, the trial court developed interim House and Senate redistricting plans ánd ordered that these plans be used only in the 2002 legislative elections. On 12 July 2002, the USDOJ precleared the trial court's interim plans.

On 31 May 2002, defendants filed a notice of appeal. Additionally, on 2 June 2002, defendants petitioned this Court to issue a writ of supersedeas and a temporary stay of the trial court's 31 May 2002 order. On 4 June 2002, in consideration of the time constraints for preclearance and for conducting the 2002 elections, this Court denied defendants' petition for writ of supersedeas and motion for temporary stay. The 2002 general election was duly held pursuant to the trial court's precleared interim plans.

On 14 March 2003, following briefing and oral argument by the parties on defendants' appeal, this Court entered an order certifying the matter to the trial court for "additional findings of fact regarding the trial court's 31 May 2002 determination that the [2002 revised redistricting plans] are unconstitutional." This order further mandated that the parties be allowed to tender proposed findings of fact for the trial court's consideration in submitting its additional findings of fact and further order. On 28 March 2002, plaintiffs submitted proposed findings of fact for the trial court's consideration. Defendants declined to submit any proposed findings. On 17 April 2003, the trial court recertified the matter to this Court with submission of its additional findings of fact and conclusions of law. The parties submitted supplemental briefs addressing these further findings and conclusions of the trial court.

In our consideration and determination of whether the trial court correctly ruled that the 2002 revised redistricting plans were unconstitutional, we begin with the relevant provisions of the State Constitution. As stated in *Stephenson I*:

The State Constitution specifically enumerates four limitations upon the redistricting and reapportionment authority of the General Assembly, summarized as follows:

(1) Each Senator and Representative shall represent, as nearly as possible, an equal number of inhabitants.

(2) Each senate and representative district shall at all times consist of contiguous territory.

(3) No county shall be divided in the formation of a senate or representative district.

(4) Once established, the senate and representative districts and the apportionment of Senators and Representatives shall remain unaltered until the next decennial census of population taken by order of Congress.

*Stephenson I*, 355 N.C. at 362-63, 562 S.E.2d at 384; *see also* N.C. Const. art. II, §§ 3, 5.

With respect to the State's role in redistricting, this Court further stated the following fundamental principles in *Stephenson I*:

"[I]ssues concerning the proper construction and application of . . . the Constitution of North Carolina can . . . be answered with finality [only] by this Court." *State ex rel. Martin v. Preston,* 325 N.C. 438, 449, 385 S.E.2d 473, 479 (1989); *see also PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 64 L. Ed. 2d 741, 752 (1980); *Murdock v. Mayor of Memphis,* 87 U.S. 590, 626, 22 L. Ed. 429, 441 (1874); *State v. Arrington,* 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984). Although there is a strong presumption that acts of the General Assembly are constitutional, it is nevertheless the duty of this Court, in some instances, to declare such acts unconstitutional. *Preston,* 325 N.C. at 448-49, 385 S.E.2d at 478; *see also Marbury v. Madison,* 5 U.S. 137, 177, 2 L. Ed. 60, 73 (1803) (stating that "[i]t is emphatically the province and duty of the judicial department to say what the law is"); *Bayard v. Singleton,* 1 N.C. 5, 6-7 (1787). Indeed, within the context of state redistricting and reapportionment disputes, it is well within the "power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan." *Scott v. Germano,* 381 U.S. 407, 409, 14 L. Ed. 2d 477, 478 (1965) (per curiam).

*Stephenson I*, 355 N.C. at 362, 562 S.E.2d at 384.

After a lengthy analysis of these constitutional provisions and applicable federal law, we outlined in *Stephenson I* the following requirements that must be present in any constitutionally valid redistricting plan:

[1.] . . . [T]o ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts. . . . In the formation of VRA districts

STEPHENSON v. BARTLETT

[357 N.C. 301 (2003)]

within the revised redistricting plans on remand, we likewise direct the trial court to ensure that VRA districts are formed consistent with federal law and in a manner having no retrogressive effect upon minority voters. *To the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established . . . .*

[2.] In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal "one-person, one-vote" requirements.

[3.] In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district . . ., the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.

[4.] When two or more non-VRA legislative districts may be created within a single county, . . . single-member non-VRA districts shall be formed within said county. *Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.*

[5.] In counties having a non-VRA population pool which cannot support at least one legislative district . . . or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the . . . "one-person, one-vote" standard, the requirements of the WCP are met by combining or grouping the *minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping;* provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard.

[6.] The intent underlying the WCP must be enforced to the maximum extent possible; thus, *only the smallest number of*

*counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard shall be combined*[.]

[7.] . . . *[C]ommunities of interest should be considered in the formation of compact and contiguous electoral districts.*

[8.] . . . [M]ulti-member districts shall not be used in the formation of legislative districts unless it is established that such districts are necessary to advance a compelling governmental interest.

[9.] Finally, we direct that any new redistricting plans, including any proposed on remand in this case, *shall depart from strict compliance with the legal requirements set forth herein only* to the extent necessary to comply with federal law.

*Stephenson I*, 355 N.C. at 383-84, 562 S.E.2d at 396-98 (emphasis added).

With these constitutional restrictions at hand, the trial court examined the 2002 revised redistricting plans. In accordance with this Court's 14 March 2003 order, the trial court submitted mixed findings of fact and conclusions of law, consistent with our well-established law in this regard. *See Brown v. Charlotte-Mecklenburg Bd. of Educ.*, 269 N.C. 667, 670, 153 S.E.2d 335, 338 (1967); *Lowe v. Department of Motor Vehicles*, 244 N.C. 353, 359, 93 S.E.2d 448, 452 (1956). These include the following:

6. The court finds that the 2002 (Sutton 5) House and Senate Fewer Divided Counties Plans did not create VRA districts consistent with Section 2 of the Voting Rights Act in Wake County in the House and Wake, Forsyth and Mecklenburg Counties in the Senate.

7. The court finds that in Wake, Mecklenburg and Forsyth Counties, there has previously been established a finding of Section 2 liability under federal law (*see Thornburg v. Gingles*, [478 U.S. 30, 35 n.2, 92 L. Ed. 2d 25, 37 n.2 (1986),]) and due to demographic changes in population there exists the required *Gingles* preconditions by which a second VRA House District should be drawn in Wake County and more "effective" VRA Senate districts drawn in Wake, Mecklenburg and Forsyth Counties.

STEPHENSON v. BARTLETT

[357 N.C. 301 (2003)]

8. The General Assembly's May 2002 Fewer Divided Counties Senate and Sutton 5 House Plans fail to comply with the requirement that in forming districts, only the smallest number of counties necessary to comply with the one-person, one-vote requirement should be combined in forming multi-county groupings.

9. The General Assembly's failure to create the maximum number of two-county groupings in the May 2002 House Plan violates *Stephenson I. See Stephenson I*, 355 N.C. at 384, 562 S.E.2d at 397.

10. The 2002 House and Senate plans enacted by the General Assembly contain districts that are not sufficiently compact to meet the requirements of the equal protection clause in that the requirements of keeping local governmental subdivisions or geographically based communities of interest were not consistently applied throughout the General Assembly's plan producing districts which were a crazy quilt of districts unrelated to a legitimate governmental interest.

11. Plaintiffs have shown that it is possible to draft Senate and House redistricting plans, which do not violate any federal or state law and harmonize requirements of the state law with federal law. In submission of these plans, the plaintiffs have successfully rebutted the presumption of constitutionality due to state legislative enactments.

12. The defendants failed to offer any evidence that a compelling governmental interest—such as the requirements imposed by federal law or impossibility—required them to violate the requirements of the North Carolina Constitution in enacting the statute.

13. The plans enacted by the General Assembly are unconstitutional.

14. There did not exist sufficient time for the General Assembly to enact new redistricting statutes and conduct orderly elections in time for preclearance and the elections of 2002 after the May 22-23 hearing.

15. The House and Senate plans enacted by the General Assembly violate the WCP, as defined by *Stephenson I*.

16. The House and Senate plans enacted by the General Assembly violate Article II, Section 5 in that they contain districts that are not contiguous.

In *Stephenson I*, this Court harmonized the provisions of Article I, Sections 2, 3 and 5, and the WCP of Article II, Sections 3(3) and 5(3) of the State Constitution and mandated that in creating legislative districts, counties shall not be divided except to the extent necessary to comply with federal law, including the "one-person, one-vote" principle and the VRA. *Stephenson I*, 355 N.C. at 363-64, 562 S.E.2d at 384-85. Consistent with this premise and as the underlying redistricting standard set forth in *Stephenson I*, this Court stipulated: "Finally, we direct that any new redistricting plans, including any proposed on remand in this case, shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law." *Id.* at 384, 562 S.E.2d at 397.

Pursuant then to this standard, we look to and consider whether the trial court's findings of fact and conclusions of law were appropriate and adequate in determining that the 2002 revised redistricting plans were not in compliance with the *Stephenson I* criteria and were therefore unconstitutional. When the trial court conducts a trial without a jury, "the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding." *Bailey v. State of North Carolina*, 348 N.C. 130, 146, 500 S.E.2d 54, 63 (1998); *see also Curl v. Key*, 311 N.C. 259, 260, 316 S.E.2d 272, 273 (1984). Once it has been determined that the findings of fact are supported by the evidence, we must then determine whether those findings of fact support the conclusions of law. *Kirby Bldg. Sys. v. McNiel*, 327 N.C. 234, 241, 393 S.E.2d 827, 831 (1990); *In re Montgomery*, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984).

The trial court found and concluded that the 2002 revised redistricting plans failed to be in strict compliance with virtually all *Stephenson I* criteria, these findings including excessive division of counties; deficiencies in county groupings; and substantial failures in compactness, contiguity, and communities of interest. Specifically, with respect to defendants' revised Senate Plan, the trial court's findings of fact included the following:

STEPHENSON v. BARTLETT

[357 N.C. 301 (2003)]

[1. Defendants' revised Senate Plan] cuts across interior county boundaries in 28 locations[, substantially more times than shown by plaintiffs to be necessary, and such plan thus] fails to strictly comply with *Stephenson*'s WCP requirement.

. . . .

[2. The county clustering system used by defendants groups] *portions of counties* to structure individual county groups [in contravention of the *Stephenson* standard that] "the requirements of the WCP are met by combining or grouping the minimum number of *whole, contiguous counties* [to create districts within the grouping that] comply with the one-person, one-vote standard." [*Stephenson I*, 355 N.C. at 384, 562 S.E.2d at 397.]

[3. Defendants' revised Senate Plan has numerous violations of the *Stephenson* mandate that districts shall be compact, the trial court citing specific illustrative examples as follows:]

A. . . . District 14 in Wake County . . . is not compact. It is distinguished by 4 major appendages. Beginning in the northern tip, it moves southeast with jutting points that end in a downward facing cul-de-sac that embraces a portion of this plan's District 36. The boundary of District 14 then meanders toward the northeast, turns to the southeast and extends a curved "arm" that carves out a "bay" in the side of District 6.

B. District 11 . . . is not compact. Its eastern boundary has been drawn in such a manner that it runs southward, then swings to the northwest, then . . . curves around a portion of Nash County to District 10, before continuing to the south and cutting through Johnston County and severing communities of interest in that area. This design also results in there being a point, interior to District 11, where Johnston and Franklin counties meet.

C. Neither District 21 [nor District] 26 . . . is compact. District 21 stretches from the western boundary of Montgomery County then moves east across the boundary of Moore County in a jagged line that moves first east, then north, then east again, turns south, makes a right turn west, then again south, before moving north to close the district where Moore meets Chatham and Randolph Counties. The complementary effect of this district's boundary is that it

results in adjacent District 26 having a southward arm and an appendage, thereby failing to be compact.

. . . .

In addition to these three illustrative cases, this court finds overall that Senate Districts 6, 10, 11, 14, 16, 36, 44 in Johnston, Nash and Wake Counties of [defendants' revised Senate Plan] are not compact, particularly as compared to the way in which they might have been drawn as demonstrated by plaintiffs' [proposed Senate Plan].

Specifically, with respect to defendants' revised House Plan, the trial court's findings of fact included the following:

[1.] The shape of [District 14] contained a narrow "arm" that protruded north, and other protrusions to the south and south-southeast, leaving the district without compactness. . . .

. . . .

[2.] The court's examination of . . . District 33 in Wake County also revealed that its shape lacked compactness. Specifically, a narrow "arm" extended to the north, northeast and a pair of "arms" meandered south and southeast in a horseshoe manner around a portion of District 34.

. . . .

[3.] District 52 . . . had been drawn to remove Carthage, the seat of Moore County government, and place it in District 51. To better preserve "communities of interest," District 52, which is anchored in Moore County, was redrawn by the court to include the City of Carthage, the county seat.

. . . .

[4.] Districts 95 and 96 . . . split the communities of Mooresville and Statesville; the court modified Districts 95 and 96 to run east-west and eliminate the splits of these boundaries in keeping with the preservation of local governments as communities of interest.

. . . .

[5. Districts in the following counties] were drawn [in defendants' revised House Plan] in a manner that divides the county boundary in multiple locations. Comparisons . . . with the

[plaintiffs' House Plan] reveal[] potential ways in which these county boundary splits could be reduced in number and bring the plan into strict conformance with the *Stephenson* constitutional criteria[:]

A. In Forsyth County, [defendants' revised House Plan] crosses the county boundary in three places, but the plaintiffs' House Plan groups counties so that Forsyth County is cut only once.

B. In Harnett County, [defendants' revised House Plan] splits this county line in three locations, as compared with only one crossing of the Harnett line in plaintiffs' House Plan.

C. In [defendants' revised House Plan] Haywood County's line is cut in two locations, as compared with only one such cut in the plaintiffs' House Plan.

D. In New Hanover County, [defendants' revised House Plan] cuts the county boundary three times; plaintiffs' House Plan crosses New Hanover's county line only one time.

. . . .

Overall, within multi-county groupings, [defendants' revised House Plan] cuts county lines 48 times, as compared to the 43 county line traverses in plaintiffs' House Plan.

. . . .

[6. Defendants' revised House Plan contains numerous violations of the *Stephenson* mandate that districts shall be compact, the trial court citing specific illustrative examples as follows:]

A. Alamance County—District 63 features an "arm" that . . . cuts the county in an east-west direction that almost bisects District 64.

B. Cleveland County—District 110 runs from the northwest . . . but makes a sharp turn to the south, resulting in an appendage pointing toward South Carolina.

C. Rowan County—The common boundary between Districts 76 and 77 has a sharply irregular shape. . . .

D. Stanly County—The general shape of District 70 has the look of a lobster claw. . . .

E. Yancey County—District 118 . . . extends an "arm" from the eastern edge of Haywood County and meanders from the northeast to southeast in a manner that divides that county.

[7.] In addition . . . this court finds that . . . Districts 18, 41, 51, 52, 57, 58, 59, 60, 61, 62, 63, 64, 76, 77, 95, 96 and 118 are not compact and fail to strictly comply with *Stephenson*. More specifically, the court finds that the [defendants' revised House Plan] includes the following districts which are not compact and do not respect communities of interest:

[A.] . . . Districts 95 and 96, which both split the town of Mooresville in southern Iredell, and Statesville in northern Iredell, . . . could easily be drawn so that the community of Statesville is intact in a northern district, and the community of Mooresville is intact in a southern district.

[B.] . . . District 52 . . . is shaped like a "C" rather than being compact, and leaves out the county seat, Carthage.

[C.] . . . [T]he City of High Point [is divided] into four districts . . ., when it is possible to divide the city only three times while complying with the one-person, one-vote standard and the Voting Rights Act.

[D.] . . . Cabarrus County [is divided] into two districts which lack compactness, on a ragged line . . . splitting the communities of Concord and Kannapolis within the county. . . .

[E.] . . . Wake County has one less VRA district and uses irregularly shaped non-VRA districts. . . . Districts 34, 35, 36, 37 and 38 are all non-VRA districts, but have irregular shapes with "fingers" sticking out into other districts. It is possible to establish two, rather than just one VRA district in Wake County, and make the adjoining non-VRA districts more compact, as demonstrated by the configuration of districts in Wake County in plaintiffs' House Plan.

. . . .

[8.] This court finds that a district whose parts are "held together" by the mathematical concept of "point contiguity" does not meet the *Stephenson* criteria for contiguity. . . . This court holds that the term "contiguity," as used in *Stephenson*, means

that two districts must share a common boundary that touches for a non-trivial distance. . . .

. . . .

Further, this court finds that the use of the "point" and "double point" constructs and "crisscrosses" can result in bizarre shapes that are not compact.

. . . .

. . . Districts 11, 21, 22, 26, 66, 68, 69, 95 and 96 . . . do not meet the contiguity requirement of *Stephenson*.

After thoroughly reviewing and considering the record on appeal, the briefs submitted by the parties, and the illustrative maps depicting each proposed redistricting plan, we conclude that the evidence supports the trial court's findings of fact, which establish numerous instances where the 2002 revised redistricting plans are constitutionally deficient. We further conclude that these findings of fact adequately support the trial court's conclusion that the 2002 revised redistricting plans fail to attain "strict compliance with the legal requirements set forth" in *Stephenson I* and are unconstitutional. *Stephenson I*, 355 N.C. at 384, 562 S.E.2d at 398. Accordingly, we affirm the trial court's determination that the 2002 revised redistricting plans are unconstitutional.

AFFIRMED.

Justices ORR and MARTIN did not participate in the consideration or decision of this case.

Justice PARKER dissenting.

Although I continue steadfast in my views as expressed in my dissenting opinion in *Stephenson v. Bartlett*, 355 N.C. 354, 399, 562 S.E.2d 377, 407 (2002) (*Stephenson I*), I acknowledge that the holding in *Stephenson I* is the law of the case. Nevertheless, after carefully considering the record and weighing the well-established principle that acts of the legislature are presumed constitutional, *see Town of Spruce Pine v. Avery Cty.*, 346 N.C. 787, 792, 488 S.E.2d 144, 147 (1997); *Jenkins v. State Bd. of Elections*, 180 N.C. 169, 170, 104 S.E. 346, 347 (1920), I am constrained to dissent respectfully from the majority opinion. I find nothing in the record to support a holding that plaintiffs carried their heavy burden of showing that the redis-

STEPHENSON v. BARTLETT

[357 N.C. 301 (2003)]

tricting plans—House Sutton 5 and Senate Fewer Divided Counties—duly enacted by the legislature on 17 May 2002 did not comply with the redistricting provisions of the Constitution of North Carolina as amended by this Court in *Stephenson I*.

The message sent today is that the redistricting plans, enacted by the duly elected members of the General Assembly applying the methodology mandated by this Court in *Stephenson I*, fail to pass constitutional muster not because the plans violate the whole-counties provision or any other provision of the State Constitution, but because the trial court perceived that in certain instances counties could have been grouped, divided, or traversed in a different configuration by applying nonconstitutionally based redistricting principles of compactness and communities of interest. Decisions as to communities of interest and compactness are best left to the collective wisdom of the General Assembly as the voice of the people and should not be overturned unless the decisions are "clearly erroneous, arbitrary, or wholly unwarranted." *Wilkins v. West*, 264 Va. 447, 463, 571 S.E.2d 100, 108 (2002). Moreover, the only limitation on the legislature's discretion regarding contiguity is that imposed under Article II, Section 3(2) and Article II, Section 5(2) of the Constitution of North Carolina. *See Painter v. Wake Cty. Bd. of Educ.*, 288 N.C. 165, 177, 217 S.E.2d 650, 658 (1975) (holding that all power not limited by the State Constitution is vested in the people as expressed through their elected representatives); *see also State ex rel. Martin v. Preston*, 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989). Definitions of "contiguity" applied in Iowa and Minnesota under different statutes, as referenced in the trial court's order, are thus irrelevant.

Lip service feigning deference to the presumption of constitutionality of legislative enactments and to the constitutional mandate of separation of powers, N.C. Const. art. I, § 6, is not sufficient. The evidence must be clear, and every doubt must be resolved in favor of a legislative enactment's constitutionality. *Jenkins*, 180 N.C. at 172, 104 S.E. at 348; *see also Turner v. City of Reidsville*, 224 N.C. 42, 46, 29 S.E.2d 211, 214 (1944) (stating that unconstitutionality must appear beyond a reasonable doubt). The evidence in this record does not meet that test. Accordingly, I vote to reverse the trial court.